KENNETH S. INGBER (SBN 174551)
ken@ingberlawyers.com
R. CHRISTOPHER HARSHMAN (SBN 248214)
chris@ingberlawyers.com
INGBER & ASSOCIATES
A PROFESSIONAL LAW CORPORATION
2029 Century Park East, Suite 1400
Los Angeles, CA 90067
Telephone:      (424) 202-3620
Facsimile:      (424) 247-0343

        - and -

ROBERT J. HANTMAN (NY State Bar No. 2066538)
rhantman@hantmanlaw.com
Pro Hac Vice Admission
HANTMAN & ASSOCIATES
1515 Broadway, 11th Floor
New York, New York 10036
Tel. (212) 684-3933
Fax. (212) 520-4301

*Attorneys for Plaintiff*
BLINGLET, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA SAN FRANCISCO DIVISION

| | |
|---|---|
| BLINGLET, INC., a Delaware corporation, | CASE NO.:  C 09-05156 SI |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | |
| AMBER ALERT SAFETY CENTERS, INC., a Nevada corporation; KAI D. PATTERSON, GALAXY MEDIA AND MARKETING CORPORATION, successor to Amber Alert Safety Centers Inc,  JOHN THOMAS FINANCIAL CORPORATION, JOHN THOMAS BRIDGE AND OPPORTUNITY FUND, JOHN DOES 1-100 | |
| Defendants. | |

**PARTIES**

Plaintiff BLINGLET, INC. complains and alleges as follows:

1.      Plaintiff, Blinglet, Inc, (www.Blinglet.com), is a Delaware Corporation, with its principal places of business located in Pleasanton, Los Angeles and San Francisco, California, which is involved in the mobile device and infrastructure solutions development business.[1]

2.      Plaintiff develops – at its own substantial cost- mobile applications using its own "proprietary software called "Blinglet SDK" along with other platforms[2] and licenses the resulting mobile applications to parties that incorporate the mobile application into their particular product in exchange for a "subscriber fee" and an agreed upon royalty subject to negotiated and agreed upon terms which are reduced to a written services agreement.

3.      Defendant Amber Alert Safety Centers, Inc. (hereinafter referred to as "Amber Ready"), (www.amberready.com), a Nevada Corporation, with its principal place of business located in Rockaway, New Jersey was one such company which, pursuant to a signed Agreement dated August 6, 2008, - as detailed hereafter - was provided with a license to use and distribute a mobile application developed by Plaintiff in order to develop and distribute content to mobile phones for the purpose of helping to locate "missing children".

4.      According to a public announcement, on or about Tuesday April 13, 2010, "Amber Ready, provider of the wireless Police Emergency Notification System acquired CK41 Direct, Inc., a leading producer of direct response infomercial campaigns".

5.      Subsequently, and without notifying this court, Amber Ready changed its name to "Galaxy Media and Marketing Corporation," and, upon information and belief, is now a publicly held parent company of the two subsidiaries, CK41 Direct and Amber Alert Safety Centers, Inc.

---

[1] Using these platforms Blinglet is able to create mobile applications which will be downloaded to users' phones through different delivery systems, such as: iTunes store, Google market, Blackberry store and from the Blinglet sites. Blinglet offers to clients the full end to end solution for mobile from SMS, MMS, WAP, mobile application and hosting solutions and development of complex administration systems.

[2] Such as Apple's SDK, Blackberry, Google Android and J2ME.

(Amber Ready and Galaxy Media and Marketing Corporation will be used interchangeable herein and shall refer to the same entity.)

6.      Defendant Galaxy Media and Marketing Corporation (hereinafter referred to as "Galaxy"), is the new name of the publicly held parent company of CK41 Direct and Amber Alert Safety Centers, Inc., (the term "Amber Ready" as referred to herein shall also include "Galaxy" when used herein).

7.      Defendant John Thomas Financial is a full-service brokerage firm with corporate headquarters located at 14 Wall Street, 23rd Floor, directly opposite the New York Stock Exchange, in New York City which, upon information and belief is a New York Corporation which  does business throughout the United States including the State of California and its actions – and those of its affiliate and/or related entity, Defendant  John Thomas Bridge and Opportunity Fund ("JTB&OF"), also believed to be a New York Corporation, and ATB Holdings, LLC, a  Delaware limited liability company,  (referred to collectively as John Thomas Financial or "JTF"), as outlined herein, caused injury to plaintiff in California, a venue in which they could be expected to be "hauled into court".

8.      Furthermore, as is outlined in greater detail herein, Plaintiff is informed and believes, and based upon such information and belief alleges, that JTF is the "alter ego" of Amber Ready and Galaxy as they dominated and exerted complete control and influence over Amber Ready and Galaxy and, based upon investigation and information and belief, JTF actually governs Amber Ready and has acted in its (JTF), personal best interests and in "bad faith" and there is such a unity of interest and ownership that the individuality, or separateness, of Amber Ready- and now Galaxy-  does not exist.

9.      Plaintiff is further informed and believes, and based upon such information and belief alleges, that Amber Ready was and is wholly undercapitalized, incapable of independently meeting its obligations,  and entirely dependent upon JTF for financial support in order to pay its creditors and fulfill its business obligations.

10.     The facts are such that an adherence to the fiction of the separate existence of JTF and Amber Ready would, under the particular circumstances of this case, sanction a fraud – on Blinglet, private investors and the public- and promote injustice.

11.     Defendant Kai D. Patterson[3] is the founder and at all relevant times was the Chief Operating Officer of Amber Ready who orchestrated and is individually responsible for the scheme to defraud Plaintiff, and to intentionally interfere with the agreement between Blinglet, Inc., and Amber Alert Safety Centers, Inc., as detailed herein.

12.     Upon information and belief defendants DOES 1-10 are individuals and/or entities whose identity will be revealed through the course of discovery but are likely to include Thomas Belesis individually and members of the Amber Ready Board of Directors who participated in those acts complained of herein either intentionally, negligently and/or completely abdicated their fiduciary duties to Amber Ready and its shareholders.

## JURISDICTION

13.     Jurisdiction and Venue are properly before this court, as the August 6, 2008 agreement contains a provision that specifically includes a choice of law and forum selection clause ("Forum Selection Clause") which states that the agreement shall be governed in accordance with the laws of the State of California and any proceeding seeking to enforce the terms of the written agreement shall be brought in Contra Costa County.  All parties referred to herein could have expected to be "hailed" into court in California as the damages alleged herein affected a company based in California and defendants engage in continuous and systematic business in California. In addition this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 in that it is a civil action between a citizen of a State and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000 exclusive of costs and interest. This Court may also exercise personal jurisdiction over defendants, as they have purposely committed within the state the acts from which these claims arise.

---

[3] Who failed to attend the previously held Mediation in violation of a court order dated April 7, 2010.

14.     This case was initially filed in State Court and on October 30, 2009, Defendant Kai D. Patterson filed a Notice of Removal pursuant to 28 U.S.C. sections 1441(a), as this Court had, and has, original jurisdiction under 28 U.S.C. section 1332, in that complete diversity of citizenship exists between the plaintiff and defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**INTRADISTRICT ASSIGNMENT**

15.     Intra-District assignment is appropriate in the San Francisco division of the Northern District pursuant to Civil Local Rule 3-2(d), as the Forum Selection Clause provides for action in Contra Costa County.

**INTRODUCTION**

16.     This action arises out of the breach and wrongful termination of an August 6, 2008 written "Services Agreement" (hereinafter referred to as the "Agreement" and attached hereto as **Exhibit "A"**),[4] and the wrongful use and misappropriation of proprietary software  developed and financed by plaintiff Blinglet Inc. (hereinafter refe**r**red to as "Blinglet" or "Plaintiff"), by defendant Amber Alert Safety Centers, Inc (hereinafter referred to as "Amber Ready"), and Kai D. Patterson, (hereinafter referred to as "Patterson"), the Chief Operating Officer of Amber Ready, and defendants John Thomas Financial Corporation, and John Thomas Bridge and Opportunity Fund ("referred to hereafter collectively as John Thomas Financial or "JTF"), as part of a fraudulent scheme and unfair business practice by which defendants, having never intended to compensate Plaintiffs' used their Amber Ready 2 Application  to raise over twelve million dollars and then wrongfully terminated their contract with Plaintiff  - having not even sent "Notices to Cure"- as required by the Agreement- and having confirmed in writing that the Application was satisfactory – and even having  "signed off on it" and even granting warrants to Plaintiff -  thereby defrauding Plaintiff and  unjustly enriching  themselves.

---

[4]Amber Ready's entitlement to use this software was entirely contingent upon its payment of the fees outlined in the Agreement, Exhibit A Sections 5 (a) and (b)[4], which required payment of a $5.00 fee for each handset that downloads or installs or subscribes to the Mobile Application for a term of one (1) year plus 17% of the amount it charged for any renewal to the Mobile Application (with a minimum payment of $1.60 for any such renewal).

17.     Blinglet had undertaken several good faith attempts to resolve this matter amicably, beginning with the August 22, 2009 correspondence, a true and accurate copy of which is attached hereto as **Exhibit "B"**, and again on August 25, 2009, with Blinglet's formal response to Amber Ready's termination letter, a true and accurate copy of which is attached here to as **Exhibit "C"**.

18.     Despite the clear and unambiguous terms of the signed Agreement and Plaintiff's advance notice regarding their intent to seek court intervention – in which the non prevailing party is responsible for payment of legal fees, per Section 21(b) of the Agreement – both Amber Ready, Patterson and JTF, refused to respond, in any meaningful way, while Blinglet is suffering and continues to suffer significant damages, while also incurring legal fees, which are the responsibility of the non prevailing party pursuant to the Agreement.

19.     Recourse to this Court, pursuant to Paragraphs 17, 21 (d) and (f) of the Agreement, entitled "Miscellaneous," is Blinglet's only hope to recover damages from defendants' continued breach of Sections 3, 4, 5, 7 and 12 of the Agreement and Section 6 of the Statement of Work ("SOW") , exhibit b of the Agreement and its fraudulent and improper and illegal use of Blinglet's software  to raise funds.

### FACTS PERTINENT TO ALL CAUSES OF ACTION

20.     For over twenty (20) years Blinglet chief operating officer, Anthony Phills (hereinafter referred to as "Phills") has been designing systems and developing solutions for companies such as Adobe, ESPN, Real Networks, Microsoft, Siemens, The Italian Trade Commission Canada, Italian Bank Canada, Italian Consult (Montreal, Canada), General Motors, Dow Jones, Intuit, Citibank, Cellular South, Bell Canada, BellSouth, FILA, Tommy Hilfiger, Richo, Videotron, Mirabel Airport, and other notables.

21.     Phills also has extensive expertise in the development of stand alone applications such as Real Player and Adobe's InDesign, and web development such as Microsoft MSN Messenger and mobile development such as FOX News Udecide end to end solution.  In 1993, he submitted and then received his first U.S. Patent #5,136,787 for KeyRules, which was licensed to Aldus -

now called Adobe - and has received a number of awards for Best Digital Rights Management Solution Software.

22.     In late 2006, Phills  joined a startup company called Bling Software, Inc., as Chief Creative Officer and started working on the first Ajax player technology, giving low end phones, such as the Razr phone, the ability to have features like an iPhone, which was launched at "Demo" in Palm Springs- an event reserved for outstanding new technologies.

23.     In 2006, while working at Bling Software, Inc., Phills also developed the first mobile home run counter for Barry Bonds fans, which allowed fans to receive notification of his homeruns within minutes while downloading wallpaper and reading his latest journal entries.

24.     Subsequently Phills  met Will Chang – part owner of the San Francisco Giants, Chairman of Westlake International Group– and a principal in the venture  Edge Holdings, LLC, (hereinafter referred to as "Edge") which served as the primary technology investment channel for Westlake International Group that has invested a total $1.5 million dollars in Blinglet to develop a backend delivery system for mobile applications and building their team of application developers in order to develop their initial applications[5].

25.     In early 2007, the investors in Blinglet's Software decided to create a mobile application development company called Blinglet, Inc., plaintiff herein.

26.     With their vast knowledge of mobile technology coupled with their user interface experience, they developed proprietary technology which allowed Blinglet to deliver a fully integrated experience from any media to mobile.

27.     As a privately owned company, its mission was to team with Fortune 500 companies, and others, such as News Corp. and FUZE, to create and bring to market dynamic mobile services and experiences.

---

[5] Their revenue model was to develop a client's application, at their own cost in exchange for a share of the revenue that passed through the application, including but not limited to, advertising, signup costs, and promotion fees.

**Contact With Amber Ready**

28.     Through a connection of Phills and Edge, from Smith Barney, Phills met Sean Flannery ("Flannery"), a sales representative, in or about February of 2008, who Blinglet retained to represent them in New York with companies or individuals that required "mobile software" applications.

29.      Subsequently, Phills met David Pierce who, on or about April 4, 2008, introduced  him and Flannery to Patterson, CEO and founder of Amber Ready, which needed a mobile solution to help parents store a child's information on mobile devices, which Blinglet was able to provide, at its own cost.

30.     Following a demonstration of Blinglet's technology Blinglet and Amber Ready agreed to negotiate and attempt to agree to material terms as reflected in a Letter of Intent ("LOI") which was to be prepared by the parties.

31.     After Phills returned from New York, he and his business development specialist, Karl Simonsen, worked together on the LOI.

**Letter Of Intent Between Amber Ready And Blinglet**

32.     Two months later, on June 6, 2008, Patterson signed a LOI with Blinglet, on behalf of and for Amber Ready, a true and accurate copy of which is attached hereto as **Exhibit "D"**.

33.     This LOI precipitated additional funding from Westlake International to develop the software required under the LOI, which included the hiring of additional employees: user interface design and web developers, WAP developers, database developer/architects and a project manager and the training of developers on the Blinglet SDK for the Amber Ready project.[6]

34.     At the time of the signing the LOI, Patterson and Phills discussed the responsibility for the servers on which the application would run - an issue pointed out explicitly in the LOI - and it

---

[6] Blinglet received an additional five hundred thousand dollars ($500,000) of funding when it signed a LOI with Amber Ready Safety Center on June 4, 2008 based on projections provided to them by Patterson, the present CEO of Amber Ready.

was agreed that Amber Ready would maintain full responsibility for its own servers as clearly stated in the relevant pages of the LOI initialed by Patterson. (Exhibit "D").

35.     In addition, the explicit terms of the LOI (in the section headed "Mobile Application License") state that Blinglet owns the application as follows: "Each party shall retain ownership of their copyrights and software but will cross license as needed to operate the Amber Ready Services."

36.     Subsequently, and after having worked together for almost two (2) months, on August 6, 2008, Phills flew to New York to meet with Patterson at the Amber Ready offices to sign and enter into the Agreement (Exhibit "A").

37.     With Cameron Laughlin, Blinglet's attorney, on the line via phone and e-mail, there were several changes made to the Agreement in order to accommodate Patterson's previously undisclosed changes.

**Specific Provisions in the Amber Ready Contract**

38.     At all times leading up to and at the signing of the Agreement, Patterson was told and completely understood that, among the key provisions of the Agreement, was Blinglet's willingness to fund the development of the mobile application in exchange for a $5 per subscriber fee.  As specifically stated in the Agreement:

> (a) <u>*Development Fee*</u>*. In lieu of a development fee Company shall guarantee Blinglet will receive minimum revenue of $50,000 within twelve (12) months of the commercial release of the Mobile Application.  If $50,000 is not received by Blinglet within 12 months of the commercial release of the Mobile Application Company shall pay Blinglet the difference between the revenues received by Blinglet and $50,000.*
>
> (b) <u>*Application License Fee.*</u> *Company shall pay Blinglet a $5.00 US fee for each handset that downloads or installs or subscribes to the Mobile Application. Any such download/installation/subscription shall be for a term of one (1) year.  Company shall pay Blinglet 17% of the amount it charges for any renewal to the Mobile Application (with a minimum payment of $1.60 for any such renewal).  Company shall pay such fees to Blinglet within 10 days after the beginning of each month for fees charged to end users/subscribers in the previous month.  The obligation to pay Blinglet survives any contract termination as long as the Blinglet developed or licensed code is used on Subscribers mobile handset."(Exhibit "A").*

39.     In addition, based on the fee structure that Amber Ready has since adopted, Blinglet was entitled to a renewal fee of $4.50 for the second year.

40.     Patterson also committed Amber Ready to launching its product before the end of 2008, during which time Blinglet absorbed the cost of development.

41.     In addition, to prevent tampering, copying or reverse engineering of the mobile application, the Agreement clearly states:

> *License Grant Restrictions.  Company agrees that it will not (a) modify the Mobile Application (without the prior written consent of Blinglet), (b) attempt to reverse assemble, reverse compile or otherwise translate or attempt to learn the source code of the Mobile Application, (c) remove any proprietary notices from the Mobile Application, (d) will not create derivative works of the Mobile Application and (e) will not authorize any third party to distribute the Mobile Application without the prior written consent of Blinglet.  Company will ensure that any End User that elects to receive the Mobile Application must accept end user terms and conditions substantially similar to the terms set forth in* <u>*Exhibit A"*</u> *("End User Terms & Conditions"). (Exhibit "A").*

42.     The Agreement further states, in SOW clause 6: <u>Marketing, Sales and Distribution</u> that the "Company shall be responsible for all marketing, sales and distribution channels of the Mobile Applications and agrees to use best efforts to market and sell the Mobile Applications to End Users." (Exhibit "A").

43.     Furthermore, SOW clause 8 of the Agreement states:

> <u>*Termination for Convenience, states:*</u> *Blinglet shall have the right to terminate this SOW at any time upon thirty (30) days notice to Company. Notwithstanding anything contained in the Agreement, upon such termination, all licenses to the Mobile Application described herein shall cease upon the effective date of such termination, except that the terms of Sections 7-21 (of the Agreement as it pertains to the Mobile Application) and any fees that have accrued prior to termination shall survive any termination or expiration of this SOW.  Upon termination or expiration of this SOW (i) each party shall return to the other any Confidential Information relating to this SOW, (ii) the license grant under Section 3 of the Agreement shall terminate and Blinglet and Company shall no longer market, promote or distribute the Mobile Application described in this SOW. (Exhibit "A").*

**Application development specifications**

44.     While there were a number of discussions on the subject Amber Ready requested that Blinglet create the mobile application under the Agreement.

45.     This project was to be known as Amber Ready II, one version of the mobile application, which would be a WAP application on the phone allowing the user to navigate to

1   http://amberready.mobi website through the web browser on their phone and have access to the

2   Blinglet mobile version of the sign up process of Amber Ready II.

3   46.     Patterson specifically agreed that whatever traffic goes through the WAP or Web

4   application would fall under the Agreement and Blinglet would receive the $5 fee.

5   47.     Therefore, based on Patterson's promises and the terms of the Agreement, Blinglet

6   created the mobile and web application for Amber Ready.

7   48.     On September 25, 2008, Blinglet completed the first mobile application solution in

8   accordance with the Agreement and Patterson and Amber Ready's request.  Amber Ready and

9   Patterson were aware of, and monitored all of the development by Blinglet.

10  49.     On September 29, 2008, Amber Ready and Patterson were informed that the Amber

11  Ready II beta version of the mobile application was now available.

12  50.     Upon receipt of this e-mail, Patterson started downloading the mobile application and

13  showing it to third parties to both promote his core business and to raise funds.

14  51.     In or about October and November of 2008, the Blinglet team continued working on the

15  mobile application solution and developed the application from the ground up.

16  52.     In or about December of 2008, Blinglet established ProjectPath, a website on which all

17  parties involved could download and save files so that both teams could have access to make

18  notes and download the latest mobile application files.

19  53.     On December 13, 2008, the first version of Amber Ready's mobile application

20  development became ready for testing.

21  54.     An e-mail to this effect was sent out to Richard Foster, Louis Roberts, David Pierce,

22  Sean Flannery and Patterson, which included the demo site so that testing could begin in

23  preparation for a soft launch.

24  55.     Blinglet then followed up with an e-mail to their investors and other key individuals,

25  informing them of the fact that Blinglet had reached its target mark with respect to the Amber

26  Ready project.

27  56.     On December 15, 2008, Uyi Ogbeide, Blinglet's technical lead, uploaded the Amber

28  Ready mobile application to the server and testing began.

57.     On December 17, 2008, Blinglet and Amber Ready started reporting their preliminary findings with the mobile application and, as a result, initial fixes to the application were implemented.

58.     On December 19, 2008, Blinglet achieved Amber Ready's deadline for delivering the two versions of the mobile application, the WAP and Web solution.

**Progress and Amber Ready Delays**

59.     As of January 9, 2009, Patterson and Amber Ready had the ability to demo the full Amber Ready system that included the mobile application (both the WAP and Web versions) as well as the administration system that was created by Blinglet outside the Agreement.

60.     Patterson and Amber Ready were then able to present this demo to third parties, including their prospective investors.

61.     In or about February of 2009, Blinglet developed the administration application and installed the administration connections between Blinglet servers and Amber Ready's servers.

62.     The installation and operation of these administration connections were beyond the scope of the Agreement.  However, Blinglet agreed to set-up and maintain these connections in order to facilitate Amber Ready's demonstration, which ultimately allowed Amber Ready to conduct a soft launch of their service in April at the PTA convention in Colorado.  This in turn allowed Amber Ready to start signing up subscribers to the mobile application.

63.     Despite the fact that the administration system was not Blinglet's responsibility, all of the work on the administration system was performed because Patterson claimed that without the administration function, Amber Ready would not be able to demonstrate the full system and would not be able to attract subscribers.

64.     Upon information and belief, on May 6, 2009, defendant JTF, announced that they raised $12 Million in private financing for Amber Ready, but only after Amber Ready was able to demonstrate to them the mobile application that Blinglet had developed.  This information was relied upon by all those who invested in Amber Ready and whose investment may be jeopardized if not lost entirely by reason of defendants actions recited herein.  See http://www.reuters.com/article/pressRelease/idUS155717+06-May-2009+PRN20090506.

65.     Between February 2009 and April 8, 2009, Amber Ready requested certain modifications to the mobile application and administration system, all of which Blinglet promptly provided, yet Amber Ready failed to meet their anticipated launch dates, all of which impacted Blinglet's anticipated revenues and continued costs, as they were absorbing and paying for all development and support associated with the mobile application and the administration system.

66.     Upon information and belief, on May 14, 2009, Amber Ready launched on Capital Hill, and in conjunction with such launch Patterson falsely stated that Amber Ready had developed the software.  At the same time, Sean Flannery and David Pierce met with Amber Ready's investors, JTF, and introduced themselves as part of the Blinglet team that developed the mobile application for Amber Ready.

67.     In fact, on May 9, 2009, Patterson, for and on behalf of Amber Ready, signed an acceptance certificate for the Mobile Application (hereinafter referred to as the "Acceptance Certificate" a true and accurate copy of which is attached hereto as **Exhibit "E"**), which clearly stated that  Blinglet had fulfilled all of its obligations with respect to the SOW.

68.     In or about June of 2009, Amber Ready continued to conduct tests on the mobile application.

69.      At this point Blinglet began to notice that there were over 8000 users on the system, despite the fact that Amber Ready was advising Blinglet that there were only 100 plus users signed up.

70.     Upon information and belief, Blinglet also discovered that an Amber Ready employee received subscriber information and received a cash payment from the subscriber for the subscription to the mobile application.  However, the employee used the test/demo credit card when entering the subscriber information into the mobile application database so that the subscriber would appear to be a test/demo subscriber rather than an actual subscriber.

**John Thomas Financial as the "alter ego" of Amber Ready**

71.     According to JTF's public announcements, "its clients include individuals, proprietorships, institutions, corporations, and other business entities. In addition to providing

retail brokerage services, the company also furnishes its Financial Consultants with original market statistical analyses on a daily basis".

72.     JTF was the facilitator of the recent merger referred to in paragraphs 4-6 herein, was the entity which raised public funds for Amber Ready, and is now the largest shareholder of Amber Ready.

73.     There are no indications that JTF invested even one cent in Amber Ready while having made millions "on the deal" based on Blinglet's Application which was never paid for and for which there was never an intention to pay for and/or market.

74.     According to defendant JTF, it has stated in public announcements that:
     "The Firm demonstrates its commitment to clients by emphasizing Financial Consultant accessibility and responsiveness, insistence on integrity and ethical behavior, compliance with industry laws, rules and regulations, and prides itself on exceeding client expectations". (emphasis added).

75.     However, as gleaned during the course of discovery, independent investigation and/or upon information and belief  the reality is that only the expectations of  Defendant JTF were exceeded, as they made millions of dollars in capital raising fees, consultant fees[7] – both  to JTF and Thomas Belesis personally , and  interest fees as they raised over twelve million dollars ($12,000,000) from public investors for Amber Ready, which upon information and belief, has only grossed approximately eleven thousand dollars ($11,000) so far, while its tax return for 2007 was ZERO and the 2008 Unites States tax return reflects income of a paltry $ 716.00 and there has been no tax return filed for 2009 and no recent audited financial statements exist – in spite of millions of dollars raised from the public – and perhaps indicative of the greed and questionable if not illegal practices of a "Wall Street" firm.

76.     Furthermore, while there were representations of income derived from "sign ups" from the New York City Housing Authority, holiday card sales, and gift certificates, plaintiff has been advised that no such records exist.

---

[7] In fact there is a "Consulting Agreement" dated December 29, 2008 between Amber Ready and ATB Holdings, LLC, with offices at 14 Wall Street Suite 5B, New York, New York and signed by Anastasios P. Belesis. – At the same time - by letter dated February 18, 2009 – Amber Ready issued JTF an additional 2,400,000 "Consulting Shares".

77.     This state of circumstances is not surprising in light of an e-mail to third parties by its former CEO and defendant herein Kai Patterson wherein he stated that JTF structured the $13.5 million investment into Amber Ready to cheat its investors.

78.     Defendant Patterson also sent an e-mail to third parties in which he attached web site links accusing JTF of fraud and improprieties.

79.     Also not surprising, is the existence of e-mails between JTF and Amber Ready relating to the subject matter of this litigation and phone calls between the cell phones of Defendant Patterson and Thomas Belesis of JTF relating to the subject matter of this litigation – none of which have been produced thus far.

80.     The actions and communications referred to above are consistent with and in furtherance of the fact that JTF is in fact the "alter ego" of Amber Ready and was an active participant in the defrauding plaintiff Blinglet - as well as the public - as detailed hereafter and, in part, by dictating what contracts[8] were entered into and how much was to be paid by Amber Ready with publicly raised funds.

81.     As the "alter ego" of Amber Ready, JTF was intimately involved in all aspects of Amber Ready's business and took an active role in all major Amber Ready decisions including all those actions between plaintiff Blinglet and Amber Ready as alleged herein.

82.     For example, JTF decided how Amber Ready spent money and dictated who, and how much they were to be paid, including but not limited to, contracts between Amber Ready and Thomas Belesis, Frank Del Vecchio, JTB&OF, PC Koch Consultants[9], Fred Brown, Presidential Inauguration Youth Concert, Hyde Park Communications, Device Anywhere, Milton Makris, James Gardner, Richard Christie, Brendon Rogers, ABC Studios and Jim Hock.

83.     In addition, as gleaned during the course of discovery, independent investigation and/or upon information and belief, JTF replaced the lawyers previously representing Amber Ready

---

[8] None of which have been produced in spite of repeated requests.

[9] In fact a two page agreement dated December 13, 2008 between Amber Ready and John Koch required Amber Ready to pay an initial fee of  one hundred and forty thousand dollars ($ 140,000) and  forty thousand dollars per month ($ 40,000) for a year.

1  with a law firm of its own choice whose retainer and fees – paid by Amber Ready, was in excess

2  of $ 250,000 and whose conflicts of interest inured to the benefit of JTF rather than Amber Ready

3  and were adverse to the creditors and shareholders of Amber Ready.

4  84.     Further, as gleaned during the course of discovery, independent investigation and/or upon

5  information and belief: a) JTF used monies earmarked for Amber Ready for travel,

6  entertainment and/or political donations, including a dinner honoring Thomas Belesis, CEO

7  of John Thomas Financial; b)  Amber Ready was compelled to make political contributions

8  which were for the benefit of JTF and, in some cases, were paid directly by Amber Ready

9  despite the fact that credit was given to JTF in order to curry "political favors"; c) an uncle of

10  JTF CEO, Thomas Belesis, serves or served as a member of the Board of Directors for Amber

11  Ready, as did a business partner of the uncle[10]; (d) a friend of Thomas Belesis was a paid

12  consultant for Amber Ready in Washington D.C. and paid approximately $80,000 per month;

13  e) JTF has charged over $1,500,000 to Amber Ready thus far, not including consultant fees,

14  funds in escrow, and monies paid by Amber Ready for or on behalf of JTF, including but not

15  limited to, expenses for the National Investment Banking Association; f) JTF used Amber

16  Ready as it's personal "piggy bank" for political "pay backs" and to pay legal fees for

17  unrelated events not associated with Amber Ready which were actually for JTF and other

18  third parties; g) JTF controls and/or controlled the Amber Ready Board of Directors; h) JTF

19  has authorized the use of false signatures; and (i) upon information and belief, JTF is directing

20  and controlling the instant litigation between Amber Ready and Blinglet.

21  85.     In addition, JTF was an active participant in Amber Ready's Times Square

22  Promotion,[11] which is believed to have cost over two million dollars and was primarily for

23  the benefit of JTF as a means to "pump" the Amber Ready stock and attract publicity for

24  [10] Amber Ready's board of directors' minutes has been requested on multiple occasions yet they
have never been turned over.

25
26  [11]  The Terrie Williams Agency Inc. 382 Central Park West New York, New York 10025,
who was retained for the promotion has since filed a lawsuit against Amber Ready and Frank
DelVechio in the United States District Court, District of New Jersey.

27

28

themselves in order to obtain more "deals' for themselves[12] as reflected, in part, by the

following e-mail and advertisements:

> **From:** kdp <kdp@amberready.com>
> **Date:** May 10, 2009 10:34:22 PM EDT
> **To:** kdp@amberready.com
> **Subject: FW: AMBER READY BROUGHT TO YOU BY JOHN THOMAS FINANCIAL TIMES SQUARE BILLBOARD!!!!**
> Dear Supporters;
>
> AMBER Ready Hits Time Square with the support of ABC Studios until May 15, 2010.
>
> VIDEO LINK: http://www.youtube.com/watch?v=Oewy-ra3c74
> See also:
> - 31 sec - May 10, 2009
> JOHN THOMAS FINANCIAL BRINGS YOU "ARE YOU AMBER READY?" MAY 2009.
> www.youtube.com/watch?v=Oewy-ra3c74 - more videos »
> Download JOHN THOMAS FINANCIAL TIMES SQUARE BILLBOARD video at
>
> www...
> Provider: Link: http://www.youtube.com/watch?v=Oewy-ra3c74; Rate: Please rate this video Views: 0 Downloads: 3; Description: JOHN THOMAS FINANCIAL BRINGS **...**
> www.savevid.com/.../john-thomas-financial-times-square-billboard.html - Cached

86.     In addition, at all times referred to herein, defendant Patterson, for and on behalf of

himself and Amber Ready, was working with/for Thomas Belesis, CEO of JTF, in order to secure

funding.  Accordingly, as detailed herein, it was imperative that Amber Ready and JTF show

investors a working application for Amber Ready 2, which was licensed to Amber Ready by

Blinglet and whose costs were borne entirely by Blinglet.

87.     An e-mail dated January 2, 2009 substantiates the importance of Blinglet finishing Amber

Ready 2 in order for a Private Placement Memorandum to be prepared by JTF, so that funds

could be raised from the public - over twelve million dollars ($12,000,000).

> **From:** Thomas Belesis
> **Sent:** Friday, January 02, 2009 5:01 PM
> **To:** kdp@amberalertsafety.com
> **Subject:** PRESENTATION MATERIAL

---

[12] This is not surprising since the February 25, 2010 letter agreement between Amber Ready and "JTF" Paragraph 13 provides that certain advertisements by Amber Ready describe the services of JTF and be paid for by Amber Ready.

Kai,

I need a updated PowerPoint presentation with all the new board members/projections and the products that are going to be launched as a presentation for the raise

Everything needs to be upgraded/sales material

Amber Ready 2 Working

The new website needs to be up before the raise

Get everything patent/ trademarks locked down,

If everything is in place I can begin the raise of $5 million the week of Jan 15th

Thomas Belesis
John Thomas Financial
Chief Executive Officer
14 Wall Street
5th Floor
New York, NY 10005
www.johnthomasbd.com

88.     However, while Thomas Belesis, CEO of JTF recognized that it was essential that the

Amber Ready 2 application be completed in order to raise funds, both he, for and on behalf of

JTF – and perhaps he personally - along with defendant Patterson, had no intention of honoring

the licensing contract of August 6, 2008 with Blinglet.  This fact is evidenced, in part, by

the fact that Amber Ready wrongfully terminated the contract, failed to make payments

as required, failed to market the application as required and, by attempting to reverse

engineer Blinglet's application.

89.     As Patterson specifically told employees of Amber Ready, in January 2009:
    "…. we ("Amber Ready" and, upon information and belief, JTF), should not worry about
    Blinglet …as once we get funded we don't need them. We could always absorb them (buy
    them) or have another company handle the application."

90.     In any event, and in direct response to the e-mail of Thomas Belesis, CEO of JTF, on January 2, 2009, and recognizing that it was crucial that Blinglet complete and deliver Amber Ready 2 so that funding could be raised from the public, Patterson sent the following e-mail:

> **From:** Kai D. Patterson [mailto:kdp@amberalertsafety.com]
> **Sent:** Saturday, January 03, 2009 12:20 AM
> **To:** 'Sibyl Alleyne'; frank.delvecchio@amberalertsafety.com; 'Richard Foster'; louis.roberts@amberalertsafety.com; frank.delvecchio@amberalertsafety.com; erik.liljegren@amberalertsafety.com
> **Subject:** RE: PRESENTATION MATERIAL
>
> Team;
>
> We must accomplish this milestone.  NO IF ANDS OR BUTS.  Please treat these tasks like they are your future.  This means everyone.
>
> Kai D. Patterson
> President/CEO
> AMBER Alert Safety Centers, Inc.
> 101 Roundhill Drive, 2nd Floor
> Rockaway, New Jersey 07866
> Direct: (908) 397-9963
> Fax: (973) 306-3004

91.     As was later apparent to former employees of Amber Ready, Patterson and Amber Ready never intended to honor the agreement and promises made to Anthony Phills of Blinglet, as all Amber Ready, Patterson and JTF wanted, was for Blinglet to complete the Amber Ready 2 application so that they could raise money.

92.     In furtherance of the scheme to defraud Blinglet, on or about January 14, 2009  Thomas Belesis, CEO of JTF, met with Patterson and other employees of Amber Ready and then later with Patterson – in private.

93.     Apparently satisfied that Blinglet was adequately fooled, that Amber Ready 2 would be delivered and that funding would be forthcoming, Patterson emerged from the meeting with Thomas Belesis very enthused and excited about the funding that now appeared to be inevitable, as JTF was being paid at least twenty percent (20%) of the funds raised – this at a time when there was no money to pay salaries or outstanding bills.

**MOU Request**

94.     On July 21, 2009, Patterson and Amber Ready e-mailed Blinglet a proposed Memorandum of Understanding ("MOU"), which ultimately sought to breach and negate the Agreement.

95.     Blinglet refused to sign the MOU and on July 22, 2009, at 4:47 am PDT, the Amber Ready server, which hosts the mobile application, lost contact with the Blinglet administration server for over an hour.

96.     Later, on July 31, 2009, Phills received an e-mail from Patterson with a Letter to Blinglet attached, a true and accurate copy of which is attached hereto as **Exhibit "F"** in which Patterson stated that *"Although we have encountered disagreements between AMBER Ready, Inc. (Hereinafter, "AMBER Ready") and Blinglets, Inc. (Hereinafter, "Blinglets"), it is in the best interest of both of our companies to shelve our disagreements at this point"*

97.     Subsequently, there were conversations between Amber Ready and Blinglet, at which time Amber Ready requested that Blinglet turn the administration service back on in exchange for Amber Ready agreeing to:  A) pay $5 fees for users of Blinglet's system; B) pay outstanding bills and August fees by wiring the funds to Blinglet's account; and, C) provide Blinglet with passwords to the mobile application.

98.     At the same time, Blinglet started looking at the code and noticed that Amber Ready had reverse engineered the application and made changes to the Blinglet code.

99.     On August 13, 2009, Blinglet began to notice clear signs that Amber Ready was engaging in activities which constituted a breach under the terms of the Agreement.

100.    First, Blinglet noticed that the mobile application had a new look and they had moved the mobile application to new servers.

101.    Second, Blinglet noticed that Amber Ready had implemented a new signup process in the mobile application without informing them.

102.    On this same date, Phills sent an e-mail to all the parties stating that "we need to talk ASAP."

103.    Following an email request, on August 13, 2009, regarding these and other issues, Blinglet received a Termination Letter, a true and accurate copy of which is attached hereto as **Exhibit "G"**, in blatant violation under the terms of the Agreement.

104.    Upon information and belief, on August 13, 2009, at approximately 3:00 pm PDT, Amber Ready turned off access to their servers and switched over to new servers and intentionally tampered with Blinglet's database for the mobile application by deleting all records on the server. This database included over 8000 plus users and is used by the mobile application to store user information when subscribers subscribe to the Amber Ready solution.

105.    In addition, on this same date, Amber Ready modified the passwords for accessing Blinglet's database.

106.     Upon information and belief, Amber Ready took these steps in order to ensure that Blinglet would have no way of knowing how many users were actually on the server or who paid for the use of the mobile application.

107.    Upon information and belief, it is now clear that Amber Ready planned to deceive and defraud Blinglet by sending the July 31, 2009 e-mail and letter and the August 3, 2009 payment, in order to gain access to Blinglet's proprietary information and sabotage Blinglet's system.

### Blinglet's Response to the Termination Letter

108.    On August 25, 2009, Blinglet sent Amber Ready their official response to Amber Ready and Patterson's August 13, 2009 termination letter (**Exhibit "C"**).

109.    In doing so, Blinglet clearly established its rights in accordance with the signed Agreement.

110.    Subsequently, while there were additional communications between Blinglet and Amber Ready, no agreement could be reached and this action followed.

### Harm to Blinglet

111.    As a direct and proximate result of Plaintiff's reasonable and justifiable reliance on the Agreement and on Patterson's numerous representations and the intentions of "JTF" to raise funding, Plaintiff developed the required mobile application which would allow Amber Ready to obtain the desired financing and the technology required to launch its service to the public.

112.    As a direct and proximate result of Plaintiff's reasonable and justifiable reliance on the Agreement and on Patterson's numerous representations and those of "JTF", Plaintiff expended significant amounts of financial resources, time and energy developing the Amber Ready application.

113.    As a direct and proximate result of defendants' attempt to fraudulently terminate the Agreement and steal Blinglet's proprietary code, Blinglet has been caused to suffer significant economic damages.

114.    By reason of the above described actions of defendants, Blinglet has suffered and continues to suffer significant damages as they are not receiving their anticipated revenues, have been impacted in their inability to raise funds and attract additional investors for other current and future projects.

115.    Blinglet engaged in all activities in the good faith performance of its obligation under the Services Agreement and, but for the signed Agreement and numerous verbal and written representations, would not have engaged in any of the activities required to develop the Amber Ready application.

## FIRST CLAIM

### (For Breach of Written Contract against Amber Ready and "JTF")

116.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 115, inclusive, as though fully set forth herein.

117.    On or about August 6, 2008, Blinglet and Amber Ready entered into a Written Services Agreement, which set forth the terms of the relationship between the parties.

118.    Plaintiff has performed all covenants, conditions and promises required by it to be performed, except for those covenants, conditions and promises he was excused from performing, or justified in failing to perform.

119.    Amber Ready materially and substantially failed to perform and breached the Agreement by tampering with Blinglet's proprietary application, by unilaterally terminating the Agreement without providing Blinglet with an opportunity, in writing, to cure any alleged problems with the application, by viewing Blinglet's source code and modifying and attempting to reverse engineer

the same, and by failing to provide Blinglet payment of a $5.00 fee for each handset that downloads or installs or subscribes to the Amber Ready Mobile Application for a term of one (1) year, plus 17% of the amount Amber Ready charges for any renewal to the Mobile Application (with a minimum payment of $1.60 for any such renewal).

120.    As a direct and proximate result of Amber Ready's breach of the Agreement, Plaintiff has been damaged, and will continue to be damaged, in an amount according to proof.

<u>**SECOND CLAIM**</u>

**(For Intentional Misrepresentation and Fraud Against All Defendants)**

121.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs inclusive, as though fully set forth herein.

122.    Plaintiff is informed and believes, and based thereon alleges, that at all times relevant herein  Amber Ready and Patterson represented and reiterated to Plaintiff that they intended to enter into and honor the terms of the Agreement and  were assured that funding was in place and that JTF, predicated  on the Amber Ready 2 Application, was going to raise the funds to pay plaintiff,  pursuant to the Agreement and to raise the funds required for marketing and raise the funds necessary for Amber Ready's business plan and consistent with the Amber Ready PPM prepared by JTF.

123.    Plaintiff reasonably and justifiably relied upon Amber Ready and Patterson's warranties and representations, believing them to be true.  Plaintiff would not have engaged in the activities described above, including Plaintiff's agreement to and performance of the terms of the Agreement, but for defendants' fraudulent misrepresentations as described above.

124.    Plaintiffs are informed and believe, and based thereon allege, that Amber Ready and Patterson made such representations to Plaintiff knowing full well that such representations were false and untrue and that JTF  was a knowing participant therein whose sole purpose was to encourage the development and delivery of the Amber Ready 2 so as to raise funds from the public through the use of a PPM and use those funds for the enrichment of themselves and others

1   who were selected by JTF to the detriment of plaintiff, the shareholders of Amber Ready and

2   eventually Amber Ready itself.

3   125.    Plaintiff was ignorant of the falsity of defendant's representations, but reasonably

4   believed them to be true.

5   126.    Plaintiff is informed and believes, and based thereon alleges, that in truth and in fact,

6   defendants  knew that were going to allow Blinglet to absorb the time and cost necessary to

7   develop and implement the mobile application that Amber Ready required, when it was their

8   intent and plan to outright "steal" and/or reverse engineer Blinglet's proprietary code – or retain a

9   third party to replace Blinglet - in order to avoid having to pay any costs, expenses or licensing

10  fees in accordance with the terms of the Agreement.

11  127.    Plaintiff is informed and believes, and based thereon alleges, that in or about June 24,

12  2009, Patterson and Amber Ready represented to Plaintiff on a conference call that the only

13  matter which was continuing to "hold things up" was the fact that they did not have the gift

14  certificate functionality on the system, as Amber Ready claimed to have over 30,000 sign ups

15  ready to go once the system was in place.

16  128.    Plaintiff undertook and completed the work required to get the gift certificate

17  functionality running, as Patterson and Amber Ready represented to Plaintiff that once the gift

18  certificate feature was functional, Amber Ready would be able to pay Blinglet the fees owed in

19  accordance with the terms of the Agreement.

20  129.    Plaintiff is informed and believes, and based thereon alleges, that in or about July 31,

21  2009, Patterson and Amber Ready  sent Plaintiff a letter representing that the Agreement was still

22  in force and that Amber Ready would honor same.

23  130.    Plaintiff reasonably and justifiably relied upon the representations made by Patterson and

24  Amber Ready, believing them to be true.  Plaintiff would not have engaged in the activities

25  described above, but for Patterson and Amber Ready's fraudulent misrepresentations as described

26  above.

27

28

131.    By reason of defendants' material misrepresentations and inducement described herein, Plaintiffs have been damaged in an amount subject to proof at trial but well in excess of this Court's jurisdictional minimum.

132.    In engaging in the conduct as hereinabove alleged, all defendants acted with malice, fraud and oppression and/or in conscious disregard of Plaintiff's rights, and intended to subject Plaintiff to cruel and unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish  defendants' and deter others from engaging in similar conduct.

### THIRD CLAIM

**(For Negligent Misrepresentation Against All Defendants)**

133.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs inclusive, as though fully set forth herein.

134.    Plaintiff is informed and believes, and based thereon alleges, that in or about August of 2008, and continuing thereafter, Amber Ready and Patterson made the warranties and representations set forth above.

135.    Plaintiff reasonably and justifiably relied upon Amber Ready and Patterson's warranties and representations, believing them to be true.  Plaintiff would not have engaged in the activities described above, including Plaintiff agreement to the terms of the Agreement, but for Amber Ready and Patterson's fraudulent misrepresentations as described above.

136.    Plaintiff is informed and believes, and based thereon allege, that in truth and in fact, Amber Ready and Patterson made these representations in order to induce Plaintiff to enter into the Agreement.

137.    Plaintiff was ignorant of the falsity of Amber Ready and Patterson's representations, but reasonably believed them to be true.

138.    By reason of Amber Ready and Patterson's material misrepresentations and inducements described herein, Plaintiff has been damaged in an amount subject to proof at trial but well in excess of this Court's jurisdiction minimum.  Plaintiff prays for leave to amend this Complaint when the true amount of their damages has been fully and finally ascertained.

139.     In engaging in the conduct as hereinabove alleged, Amber Ready and Patterson acted with malice fraud and oppression and/or in conscious disregard of Plaintiff's rights, and intended to subject Plaintiff to cruel and unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Amber Ready and Patterson and deter others from engaging in similar conduct.

**FOURTH CLAIM**

**(Common Count for Services Rendered against Amber Ready and "JTF")**

140.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, inclusive, as though fully set forth herein.

141.     In or about August of 2008, Amber Ready requested, orally and in writing that Blinglet perform additional services for Amber Ready's benefit outside the scope of the Agreement, for which services Amber Ready agreed to pay for.  Patterson and Amber Ready requested the ability to text amber2 to the number (310) 940-3113 so that the user would receive a text message with the link to the mobile application on their phones.  Another service that Patterson and Amber Ready requested was to resize images based on the different networks (carriers).  Blinglet incorporated this functionality into the mobile application.  These were all development services outside the scope of the mobile application that Blinglet agreed to develop and supply to Amber Ready under the Agreement.

142.     Plaintiff performed all the services requested in full.

143.     Amber Ready has failed to pay Plaintiff for the services rendered and as a direct and proximate result of Amber Ready's failure to pay; Plaintiff has been damaged, and continues to suffer damages, in an amount according to proof.

**FIFTH CLAIM**

**(For Money Had and Received by Amber Ready and "JTF")**

144.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs inclusive, as though fully set forth herein.

145.     Pursuant to the Agreement, Plaintiff is entitled to a payment of a $5.00 fee for each handset that downloads or installs or subscribes to the Amber Ready Mobile Application for a

1  term of one (1) year, plus 17% of the amount Amber Ready charges for any renewal to the

2  Mobile Application (with a minimum payment of $1.60 for any such renewal).

3  146.    Amber Ready became indebted to Plaintiff in a sum subject to proof at trial, but estimated

4  to exceed the Court's jurisdictional limit, for money had and received by Amber Ready for their

5  use and benefit.

6  147.    Neither the whole nor any part of monies owed has been paid.

7  148.    Plaintiff has been damaged in an amount subject to proof at trial, but estimated to exceed

8  the Court's jurisdictional limit.

9  **SIXTH CLAIM**

10 **(For Violation of California Business and Professions Code §§17200 ET SEQ. Against All**

11 **Defendants)**

12 149.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing

13 paragraphs inclusive, as though fully set forth herein.

14 150.    By reason of the acts and omissions previously detailed above, including but not limited

15 to misrepresenting the true ownership of the proprietary software described herein in the PPM

16 prepared by JTF, all defendants jointly and severally, have intentionally violated California

17 Business and Professions Code §§17200 thereby causing injury to plaintiff and the public

18 including those who have, or plan on subscribing with Amber Ready.

19 151.    Plaintiff is informed and believes and on such information and belief alleges that Amber

20 Ready, Patterson and "JTF" have engaged in the same or similar unfair, unlawful and immoral

21 conduct with others.

22 152.    Plaintiff is an interested corporation within the meaning of California Business and

23 Professions Code § 17204, because they are direct victims of all defendants' unlawful business

24 practices and have suffered actual damages as a consequence thereof.

25 153.    Unless restrained, all defendants will continue to engage in the above described unlawful

26 and unfair business practice.

27

28

154.    All defendants should be restrained pursuant to California Business and Profession Code § 17203, from employing and continuing to engage in any of the unlawful, unfair and despicable business practices alleged in this Complaint.

155.    All defendants should be ordered pursuant to California Business and Profession Code § 17203, to disgorge and make restitution to Plaintiff of all money or property which they have acquired as a result of unlawful practices described above, and to pay interest accrued at the maximum legal rate according to proof on the money ordered disgorged.

156.    Plaintiff is without an adequate remedy at law and will suffer irreparable damage and injury if all defendants are not enjoined from engaging in and perpetrating their unlawful practices.

## SEVENTH CLAIM

### (For Conversion Against Amber Ready and "JTF")

157.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs inclusive, as though fully set forth herein.

158.    Plaintiff owned and possessed the proprietary code and software which was developed by Plaintiff in accordance with the terms of the Agreement.

159.    Defendant Amber Ready intentionally took possession of Plaintiff's proprietary code and proprietary software for the purpose of making same their own, without compensating Plaintiff in accordance with the terms of the Agreement.

160.    Plaintiff did not consent to Amber Ready's conversion of their proprietary code and proprietary software.

161.    Plaintiff has been damaged in an amount subject to proof at trial, but estimated to exceed the Court's jurisdictional limit.

162.    Amber Ready's conduct, described herein above, was a substantial factor in causing harm to Plaintiff.

///

///

## EIGHTH CLAIM

**(For Misappropriation of Trade Secrets Against All Defendants)**

163.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs inclusive, as though fully set forth herein.

164.    Plaintiff at all times owned the proprietary code and proprietary software that was developed under the terms of the Agreement.

165.    This proprietary code and proprietary software was a trade secret of Plaintiff and considered confidential information under the terms of the Agreement at the time of the misappropriation.

166.    Amber Ready improperly used and disclosed the above described trade secrets.

167.    Plaintiff was harmed and Amber Ready was unjustly enriched as a result of the misappropriation of Plaintiff's trade secrets.

168.    Amber Ready's use and disclosure of Plaintiff's trade secrets was a substantial factor in causing harm to Plaintiff and which caused Amber Ready to be unjustly enriched.

## NINTH CLAIM

**(For Violation of California Common Law Unfair Competition and Unfair Business Practices Against All Defendants')**

169.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, inclusive, as though fully set forth herein.

170.    By reason of the foregoing, Plaintiff asserts a claim for damages, injunctive relief, costs and attorneys' fees for violations of California common law against unfair competition and unfair business practices, in excess of the jurisdictional minimum of this Court.

## TENTH CLAIM

**(For Declaratory Relief Against Amber Ready)**

171.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs inclusive, as though fully set forth herein.

172.    Pursuant to the Agreement, Plaintiff is entitled to payment of a $5.00 fee for each handset that downloads or installs or subscribes to the Amber Ready Mobile Application for a term of one

(1) year, plus 17% of the amount Amber Ready charges for any renewal to the Mobile

Application (with a minimum payment of $1.60 for any such renewal).

173.    Plaintiff is informed and believes that Amber Ready has no intention of remitting future

subscription and/or renewal fees to Plaintiff pursuant to the terms of the Agreement.

174.    A judicial declaration is necessary and appropriate at this time to determine the respective

rights and obligations owed to Plaintiff under the terms of the Agreement.

## ELEVENTH CLAIM

**(For Intentional Interference with an Existing Contractual Relationship Against All**

**Defendants and DOES 1-10)**

175.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing

paragraphs inclusive, as though fully set forth herein.

176.    Plaintiff is informed and believes, and based thereon alleges, that in truth and in fact,

Patterson and DOES 1-10 were at all times aware of the existence of and, the specific terms of,

the Agreement between Blinglet and Amber Ready.

177.    Plaintiff is informed and believes, and based thereon alleges, that in truth and in fact,

Patterson and DOES 1-10 intentionally acted to interfere with the Agreement and disrupt the

relationship between Blinglet and Amber Ready, which they were successful in doing and, which

has and continues to cause significant economic harm to the Plaintiff as a direct and proximate

result of Patterson and DOES 1-10's tortuous interference.

178.    Plaintiff has been damaged in an amount subject to proof at trial, but estimated to exceed

the Court's jurisdictional limit.

## TWELFTH CLAIM

**(For Aiding and Abetting Against DOES 1-10 and "JTF")**

179.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing

paragraphs inclusive, as though full set forth herein.

180.    Plaintiff is informed and believes, and based thereon allege, that in truth and in fact,

DOES 1-10 and JTF  were aware of the fact that the Agreement existed between Blinglet and

1    Amber Ready and were aware that Amber Ready and Patterson's conduct would constitute a

2    breach of the Agreement.

3    181.    Nevertheless, DOES 1-10 and JTF gave substantial assistance to Amber Ready and

4    Patterson in order to accomplish the acts which constitute a clear breach under the terms of the

5    Agreement in order to enrich themselves or investors who would profit from the

6    misappropriation of Blinglets software and application at no cost to Amber Ready.

7    182.    Plaintiff has been damaged in an amount subject to proof at trial, but estimated to exceed

8    the Court's jurisdictional limit.

9                                    **PRAYER**

10           WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants as

11   follows:

12           1.      For general damages against Defendants according to proof;

13           2.      For exemplary and punitive damages against Defendants in an amount sufficient

14   to punish Defendants and to deter others from similar conduct;

15           3.      For Declaratory Relief;

16           4.      For Injunctive Relief and for an Accounting;

17           5.      For attorneys' fees and costs of suit herein;

18           6.      For the appointment of an independent certified public accountant to render a

19   audit of Amber Ready;

20           7.      For a Referral to the U.S Attorney's Office for further action;

21           8.      For such other and further relief as the Court may deem just and proper.

22   Dated: June 3, 2010

                                            INGBER & ASSOCIATES
23                                          www.ingberlawyers.com

24

25                                          Kenneth S. Ingber
                                            Attorneys for Plaintiff
26                                          2029 Century Park East
                                            Suite 1400
27                                          Los Angeles, CA 90067
                                            Tel: (424) 202-2620
28                                          Fax: (424) 247-0343

-and-

**Hantman & Associates**
www.hantmanlaw.com

Robert J. Hantman
(*Admitted Pro Hac Vice*)
Attorneys for Plaintiff
1515 Broadway
11th Floor
New York, New York 10036
Tel: (212) 684-3933
Fax: (212) 520-4301